PICCARRETA DAVIS KEENAN FIDEL PC
2 East Congress Street, Suite 1000
Tucson, Arizona 85701-1782
(520) 622-6900
Michael L. Piccarreta
State Bar No. 003962
Email:  mlp@pd-law.com
Jefferson Keenan
State Bar No. 013896
Email: jkeenan@pd-law.com
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>          Plaintiff,<br><br>v.<br><br>Keith A. Bee,<br><br>          Defendant. | No. CR-18-01793-001-TUC-JAS (DTF)<br><br>DEFENDANT'S OBJECTIONS TO AND COMMENTS ON PRESENTENCE INVESTIGATION REPORT<br><br>[The Honorable James A. Soto] |

The defendant, Keith A. Bee, by and through his undersigned counsel, pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure, hereby submits his objections and related comments to the Presentence Investigation Report ("PSI").

**Introduction**

This Court will be imposing sentence on Mr. Bee pursuant to his guilty plea to one count of making and subscribing a false income tax return in violation of 26 U.S.C. § 7206(1). The Internal Revenue Service (IRS) began an audit of Mr. Bee in February 2014 for tax year 2011, and the investigation expanded into tax years 2012 and 2013. The investigation involved Mr. Bee and his business, Bee Line Transportation, LLC. The

government's disclosure was extensive (in excess of 80,000 pages of documents), and the matter was designated a complex case. (Doc. 24). The information set forth in Part A ("THE OFFENSE") of the Presentence Investigation Report is derived from the Special Agent Report ("SAR") prepared by Internal Revenue Service Special Agent Vanessa Miller. The SAR was finalized on January 3, 2018 and was the product of investigation that occurred prior to that date. Subsequent to Mr. Bee's indictment in September of 2018, the defense conducted investigation and retained two expert forensic accountants who reviewed the case and key portions of the disclosure. This and other defense investigation resulted in information and evidence that was not available to the government when the SAR was prepared. In the four years since the issuance of the report, the factual assertions therein have been carefully reviewed by the parties (including extensive review by court-appointed forensic accounting experts), and the report is now known (with the benefit of hindsight) to contain errors and disputed facts that, for the most part, were not brought to the attention of the IRS prior to the filing of the report. Through diligent efforts, the parties were able to meet and confer and were able to address mistakes, inaccuracies, and disputes to arrive upon a stipulated factual basis.[1]

---

[1] As a result of the resolution of various issues, the total tax loss attributable to Mr. Bee was reduced for calendar year 2011 from $217,531.00 to $24,884.00; for 2012, it was reduced from $118,369.00 to $27,857.00; and for 2013, it was reduced from $252,050.00 to $161,673.00. Thus, the initial SAR as quoted in the draft PSI, for tax years 2011-2013, showed a tax liability of $587,950.00, while the tax liability after adjustments and corrections is $214,414.00, for a reduction in the tax liability of $373,356.00. The stipulated factual basis for the plea agreement notes that not all of this tax liability is agreed to be the product of civil fraud.

Insofar as the PSR includes information from the 2018 SAR, the defense believes that this additional information should be provided to the Court. The negotiated statement of facts which formed the basis for the plea and the basis for Mr. Bee's sentencing are stipulated and agreed upon by the parties. Items contained in the SAR that are not specifically discussed in the statement of facts for the plea agreement are not agreed to by the defendant. This information that is being provided to the Court does not affect the agreed-upon stipulated sentence of 0 to 10 months, nor does it impact the full acceptance of responsibility, but it is believed it should be provided to the Court so that it would have the benefit of the defense perspective as to some of the original references in the January 3, 2018 SAR.

## Applicable Law

While Mr. Bee does not dispute that the PSI generally accurately sets forth the facts of the investigation revealed in the SAR, it is now known that some of the factual assertions set forth therein are not accurate. Under settled law, a defendant's "[f]ailure to object to a fact in a presentence report, or failure to object at the hearing, acts as an admission of fact" and "[b]ased on Defendant's failure to object, that factual assertion is accepted as true." *United States v. Mercado-Moreno*, 869 F.3d 942, 957-58 (9th Cir. 2017) (citation omitted). Moreover, "[i]n order to focus the issues prior to sentencing, the parties are *required* to respond to the presentence report and to identify any issues in dispute." *United States v. Lopez-Cavasos*, 915 F.2d 474, 477 (9th Cir. 1990) (quoting Commentary to U.S.S.G. § 6A1.2, emphasis supplied by *Lopez-Cavasos*). When a defendant raises objections to the PSI, the government bears the burden of proving, by a preponderance of the evidence, the facts supporting the defendant's sentence. *United States v. Showalter*, 569 F.3d 1150, 1160

(9th Cir. 2009).

However, this Court is not required to resolve all disputed matters within the PSI. Rather, the Court may "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). Accordingly, when there are disputes over the factual information set forth in a PSI, the court need not resolve the dispute, and may rely instead on the agreed-upon factual basis of a plea agreement. *See United States v. Rodriguez*, 853 Fed.Appx. 409, 411 (11th Cir. 2021) (per curiam) (the district court indicated that it would not rely on the disputed factual narrative in the PSI, but rather that it would rely on the factual basis in the plea agreement); *United States v. Dixon*, 527 Fed.Appx. 524, 525 (7th Cir. 2013) ("The probation office incorporated the entire factual basis set forth in the plea agreement into the presentence report, which was adopted by the district court without objection"); *cf. United States v. Johnston*, 789 F.3d 934, 943 (9th Cir. 2015) (trial court's "statement clarified that Johnston's sentence was based solely on facts that were proven to the jury and the undisputed sections of the presentence report").[2]

---

[2] *See also James v. United States*, 2019 U.S. Dist. LEXIS 147043, *2, 2019 WL 4122189 (E. D. Tenn. 2019) (stipulated facts contained in the factual basis in the plea agreement were repeated in presentence investigation report); *Brown v. United States*, 2016 U.S. Dist. LEXIS 30852, *3, 2016 WL 1030152 (W. D. N. C. 2016) ("presentence report included the complete Factual Basis that was filed along with his plea agreement"); *Angarita v. United States*, 2010 U.S. Dist. LEXIS 73916, *18 (S. D. Fla. 2010) ("The Presentence Investigation Reports ("PSI") prepared by the Probation Office contained the same facts that were set forth in the Agreed Factual Basis, and computed the sentence in accordance with the recommendations made in the Plea Agreement").

4

With these principles in mind, Mr. Bee submits the following objections and comments to the information set forth in the PSI.[3]

**PART A. THE OFFENSE**

**<u>Charge(s) and Conviction(s)</u>**

**¶1** **On September 5, 2018, an indictment was filed in U.S. District Court, Tucson, Arizona, charging Keith Allan Bee with three counts of making and subscribing a false return in violation of 26 USC § 7206(1) and one count of corrupt endeavor to impede in violation of 26 USC § 7212. Count 1 alleges that on or about October 15, 2012, Bee willfully caused a federal income tax return to be filed which he did not believe to be correct. Count 2 alleges that on or about October 15, 2013, he willfully caused a federal income tax return to be filed which he did not believe to be correct. Count 3 alleges that on or about October 15, 2014, he willfully caused a federal income tax return to be filed which he did not believe to be correct. Count 4 alleges that on or about April 22, 2015, Bee who was being audited by the IRS provided altered vendor invoices to substantiate expenses which were deducted as business expenses on his tax returns. The invoices he provided to the IRS did not match the invoices from the vendors.**

The PSI here refers to purportedly altered documents involving Schlegel Construction and the Ford Motor Company. Subsequent to the indictment, the defense interviewed the owner of Schlegel Construction, Brian Schlegel, and was advised that the invoices that were previously provided to the government were recreations of the construction company after the fact and not copies of the original billings. When the original billings were provided to Mr. Bee at the time of their issuance, he in turn provided to the government, those billings, which matched the checks from Mr. Bee's account for those payments. Similarly, the dates of the checks corresponded with the dates on the invoices.

---

[3] For the Court's assistance, Mr. Bee will reproduce here the challenged paragraphs in the PSI.

Thus, it appears that Mr. Bee did not provide false invoices to the government relating to the construction, and this is supported by the interview with Mr. Schlegel, the actual checks that provided payment, and the invoices that were received by Mr. and Mrs. Bee, likely at the scene of the construction. With regard to the documents from Ford Motor Company, counsel and the IRS were unable to obtain originals, or even duplicate originals, of the documents for comparison purposes. Mr. Bee has indicated he did not alter any such documents, nor would any alleged alterations have kept information from the IRS that they did not already possess, but without review of the actual documents or duplicates thereof, the defense is unable to provide additional information or further clarification.

**¶ 2     The defendant made his initial appearance on September 28, 2018, pursuant to a summons and was released on his own personal recognizance without pretrial supervision the same day. On August 27, 2021, the defendant pleaded guilty to Count 3 of the indictment. Pursuant to Rule 11(c)(1)(C), the written plea agreement stipulates to an imprisonment range of zero to 10 months based on a one-level variance because the defendant is in Criminal History Category I. The defendant also agrees to immediately pay restitution in the amount of $214,414 plus $128,719.05 in interest for a total of $343,133.05 for tax years 2011, 2012, and 2013. He agrees to waive his appeal rights if sentenced in accordance with the agreement. Counts 1, 2, and 4 of the indictment will be dismissed. The defendant further agrees to pay all required state income taxes.**

The precise language relating to state income taxes is "Defendant agrees to pay any additional taxes lawfully assessed by the State for tax years 2011, 2012, and 2013. If such taxes are assessed, defendant agrees that as a condition of probation or supervised release, he will provide proof that he has paid all outstanding State tax assessments for such tax years or has entered into an agreement with the State to pay the taxes assessed in installments if agreed upon by the State." Doc. 104, p. 5.

## The Offense Conduct

**¶4    The IRS began an audit of Bee in February 2014. An IRS agent met with Bee for the first time in March 2014. The initial audit was for tax year 2011. It expanded to tax years 2012 and 2013. The IRS found that Bee evaded the assessment of federal income taxes for those three tax years. He did so by diverting funds from his company, Bee Line Transportation, LLC (Bee Line) to pay personal expenses. He concealed the nature of these personal expenses from his bookkeeper and sister, Cynthia Bee Franklin, who worked for him from 2001 to 2016. He also concealed the nature of his personal expenses from his income tax preparer, Jeffrey Hill, a self-employed registered tax return preparer who prepared Bee's tax returns for 20 years.**

Subsequent defense interviews of Cynthia Franklin indicate that she believes nothing was concealed from her and that the nature of any personal expenses was not intentionally concealed from accountant Jeffrey Hill. There was confusion and mistakes were made in the QuickBooks entries that were provided to Hill, and there was no follow-up by Hill to clarify any expenses, including ones that were obviously errors. Ms. Franklin confirmed that she entered all expenses into QuickBooks and that, subsequent to the IRS audit, Mr. Bee took a much more active role in categorization of expenses.

**In addition, Bee made false statements and provided altered documents to an IRS agent while he was under civil examination.**

With regard to the allegation of altered documents, *see* response to ¶ 1.

**¶ 5    Bee used Bee Line to fund several personal real estate purchases and to bankroll improvements to these properties. The improvements included a custom pool and spa and a 4,000 square foot heated and cooled garage for his personal vehicle collection.**

*See* responses to ¶¶ 13, 15, 16, 17, 18, and 21.

**He used Bee Line to fund the purchases of high-performance sports cars and a motorhome as well as the custom restoration of other vintage collector vehicles.**

*See* responses to ¶¶ 6, 7, 12, 19, 20, 21, 22, and 23.

**He falsely represented to Hill that the homes were business properties, and the vehicles were trucks or buses. He directed Hill to capitalize and depreciate these properties and vehicles on Schedule C of his tax return.**

*See* response to ¶ 21.

**He maintained a separate business checking account which was under his sole control to pay personal expenses. He directed Hill to code these expenses as business expenses.**

*See* response to ¶ 8.

**He also affected a fraudulent 1031 exchange in which he exchanged a condemned bus lot for a $750,000 custom home. He told Hill it was a like-kind exchange of a business property for a business property which resulted in the deferral of capital gains on his federal income tax returns.**

*See* response to ¶ 16.

**¶ 6    A majority of the fraudulently deducted expenses pertain to Residential Property Expenses and Collector Vehicle Expenses. The total tax due and owing which resulted from Bee's actions was $217,531 for tax year 2011, $118,369 for tax year 2012, and $252,050 for tax year 2013 for a total tax loss of $587,950. The Government has since indicated the total tax loss is $214,414 due to adjustments to the tax implications of what Bee was doing. The capital gains monies are not included.**

The original computations not only differ from the current computations, but the

original computations done by both the Revenue Agent and the Special Agent differed from

each other. The Revenue Agent computed the 2011 income tax liability to be $74,219, and

the Special Agent computed the same to be $217,531. The Special Agent's current

computation for 2011 is $24,884. The Revenue Agent computed the 2012 income tax

liability to be $108,119, and the Special Agent computed the same to be $118,369. The

Special Agent's current computation for 2012 is $27,857. The Revenue Agent computed the

2013 income tax liability to be $265,279, and the Special Agent computed the same to be

$252,050. The Special Agent's current computation for 2013 is $161,673. The Special Agent originally calculated a total tax due and owing for the years 2011 through 2013 of $587,950. However, the tax liability for those years, after adjustments and corrections, is now $214,414. This represents a reduction in tax liability of $373,356. The capital gain of $178,000 was a deferred gain and not recognized in the 2011 tax year. None of this is a criticism of the Revenue Agent or Special Agent but a product of clarification after numerous meetings with the Special Agent and the consulting expert. Had Mr. Bee received proper representation during the audit, this information could have, and should have, been provided to the Internal Revenue Service at that time but was not.

¶ 7 **Franklin prepared the financial records for Bee Line using QuickBooks. She was the only employee with access to QuickBooks and was primarily responsible for accounts payable and payroll, bank reconciliations, profit and loss statements, and balance sheets. Franklin or Bee gave the profit and loss statements and balance sheets to Hill to prepare the Schedule C to be filed with Bee's federal income tax returns. Franklin or Bee also prepared a schedule of fixed assets purchased or sold during the year which they gave to Hill for Bee's tax returns. Most of the fraudulent activity was conducted out of Bee's BBVA Compass Business Checking account. Bee maintained the checks and the check ledger, wrote checks on the account, and met with Franklin periodically so she could enter the expenses into QuickBooks. Franklin told the IRS most of the expenses were self-explanatory, and she knew how to categorize them. When she did not know how to categorize an expense, Bee would tell her how to enter it into QuickBooks. She related she did not always see an invoice or receipt for these expenses. She indicated Bee signed the checks and most of the deposits were Bee Line business receipts from school districts and social clubs.**

Actually, although Mr. Bee is responsible for all inaccurate characterizations of personal expenses as business expenses, and such errors relating to the characterization of personal vehicles formed the basis of his plea, in most of the other areas, it was primarily based on Mr. Bee's lack of focus, supervision, and negligence in the operation of his business

9

accompanied by ineptitude by his tax preparer. That does not in any way minimize Mr. Bee's role in the offense or responsibility for any tax losses, but it does simply complete the picture. Mr. Bee became much more active in the characterization of expenses and did have a more active role in the review of his business after the audit, when numerous issues were brought to his attention. Mr. Bee, during the relevant time periods, was working more than full-time as a justice of the peace, involved in numerous administrative responsibilities both locally and on a statewide basis, and, on top of that and also garnering the smallest amount of his attention, was the operation of his business.

**¶ 8     In April 2011, Bee and his wife opened a business checking account with JP Morgan Chase. He and his wife were the only authorized signers on this account. There was minimal activity in the account and most of the debits were personal in nature. Some debits were written to the business account at Compass Bank.**

A review of the transactions of this business checking account indicates that almost all of the transactions paid from this account were related to business, although a few isolated payments from this account were personal expenses that were wrongfully attributable to the business.

**¶ 9     Hill had a power of attorney and represented Bee during the IRS audit from March 2014 to May 2015. Hill had discussions with Bee about line items that were expensed and should have been capitalized, and personal expenses which appeared to be falsely deducted on Bee's return. Hill let Bee know which journal entries needed to be adjusted to correctly reflect only business expenses, and Bee agreed to these adjustments. Hill prepared a preliminary amended Form 1040X and amended Bee's U.S. Individual Income Tax Return for tax year 2011. In April 2015, the IRS expanded the audit to tax years 2012 and 2013 and requested the QuickBooks records. Bee indicated they had been adjusted and that 2012 and 2013 were cleaner than 2011 because he corrected the problem of capital assets being expensed.**

Hill did not have any extensive discussions with Mr. Bee about items to be expensed that should have been capitalized and personal expenses which appeared to be falsely deducted on the return. Hill's files on Mr. Bee for the relevant tax returns do not support Hill's claims. From counsel's perspective, Hill's explanation appears to be an after-the-fact excuse to avoid responsibility for his lack of diligence. Indeed, Hill spent little to no time on Mr. Bee's tax returns, as indicated by his billings for the preparation of the tax returns. For example his bill for preparation of the returns in 2011 was $1,055.00; in 2012, it was $630.00; and in 2013, it was $1,060.00. These numbers were based on an hourly rate and demonstrate a lack of time spent. These tax returns and the underlying records were complex matters and needed skilled, competent tax preparation. To do a competent job on these returns, it would have taken many multiples of the hours that Hill expended and required much more review and interaction with the client, bookkeeper, and QuickBooks. In regard to the preparation of the amended return, that return was prepared without Mr. Bee's knowledge or review, but it, too, was negligently prepared. It is uncertain whether this amended return was ever formally filed.

**¶ 10    In May 2015, Bee visited Hill's office and fired him after retaining counsel, Charles Smith, to handle the audit. Hill's firing took place before he could give Bee a copy of his amended tax return for tax year 2011. In June 2015, Smith let the IRS know he had power of attorney and would be representing Bee during the audit.**

Mr. Bee's memory of the termination of Hill differs dramatically from Hill's. Hill did not show up for a meeting with the IRS, and Mr. Bee attempted to contact Hill multiple times but received no response from Hill. After multiple unanswered communications, Mr. Bee simply never contacted Hill again and retained counsel as a power of attorney.

**¶ 11**    **The IRS reconciled the tax returns with Bee Line's profit and loss statements for 2011, 2012, and 2013. There were immaterial discrepancies for some income and expense line items. There were significant discrepancies in depreciation expenses. Hill reported Franklin did not update depreciation expenses. Franklin admitted she did not update the expenses. For tax year 2011, the QuickBooks for Bee Line revealed a depreciation expense of $2,351. The 2011 tax return reflected depreciation expenses of $468,366. For tax year 2012, the QuickBooks for Bee Line revealed no depreciation expenses, and the tax return reflected depreciation expenses of $496.323. For tax year 2013, the QuickBooks for Bee Line revealed no depreciation expenses, and the tax return reflected depreciation expenses of $1,012,413. The IRS determined personal expenses were being fraudulently booked and then ultimately deducted on the tax returns.**

The bookkeeper, Mr. Bee's sister, Cynthia Franklin, updated the depreciation expense every year to the best of her ability. It is acknowledged that, although she did the very best she could, and in many instances did very well, she did have her limitations as a bookkeeper, which were well known to Hill and Mr. Bee. It is Mr. Bee's memory that the thumb drive with the Bee Line QuickBooks file, which contained the depreciated expenses, was given to Hill, and Hill would return it to Bee Line after taxes were filed. Ms. Franklin would then update the QuickBooks accordingly with the edits from Hill. Although the depreciation was inaccurate, a portion of the problem with the depreciation, which was computed by Hill, was that one year the QuickBooks file that was returned to Bee Line was corrupted, which Hill stated could not be remedied. This is unsurprising to Mr. Bee because during his only visit to Hill's office during the audit, Hill's computer crashed multiple times. However, the ultimate responsibility for accurate depreciation lies with Mr. Bee, and it is acknowledged that the depreciation contained on the tax returns in question was inaccurate and, in regard to the named vehicles, should not have been depreciated as business vehicles.

**¶ 12    Bee told the IRS the general ledger had been adjusted since the tax returns were prepared. The IRS compared the original profit and loss statements with the revised ones and found the most significant adjustments were made to the 2012 general ledger and to the accounts for vehicle insurance; interest; vehicle, general repair, and maintenance; and property taxes. The only significant changes to the 2013 return were from various expense accounts to a general ledger account entitled "Jeff Hill Temp" which was a holding account.**

The adjustments to the general ledger were made at Hill's request with regard to the prior years that had been added to the audit and reflected adjustments as the result of information learned during the 2011 audit.

**¶ 13    The personal expenses deducted for residential property included the property taxes of one home for tax year 2013 for $2,659.93. Another personal residence was listed as a commercial bus property and $5,719 in depreciation expense and $18,738.77 in taxes and interest related to the mortgage were deducted. There was another personal residence which was not used as a commercial bus location or as a home by the Bee family, and Bee directed Hill to capitalize this property as a business property on a Bee Line fixed asset ledger. This property was fraudulently depreciated and expensed on Schedule C as $9,667 for tax years 2011, 2012, and 2013. Two homes in Casa Grande, Arizona, were also used for deductions. Bee used one of the homes as a personal residence and fraudulently deducted $7,245 on his Bee Line 2013 tax return. The journal entry to book this mortgage payment was split between parts, tools, supplies, and fuel. The IRS indicated this was an apparent attempt to hide the true nature of this personal expense. The other home in Casa Grande was used as a secondary residence and was not a Bee Line business property. Bee directed Hill to capitalize the property on his company's fixed asset register and depreciate it. Depreciation expenses of $7,087 for tax year 2011, $7,086 for tax year 2012, and $7,086 for tax year 2013 as well as $10,493.18 in various other expenses for tax year 2011, and $23,204.26 in various other expenses for tax year 2012 were deducted.**

Property taxes are always deductible on such properties. The "personal residence" located at 4045 S. Saguaro Monument Place was not listed as a commercial bus property. The home was used as a temporary location business office and then later rented to a third party as an investment. The same property is where the bus warehouse/repair building had

13

been built. The other "personal residence," located at 2302 N. Camino Cascabel, was initially purchased to possibly become a personal residence along with a business office. However, the property was in such disrepair it could not be done, and eventually it was sold at a loss. Hill was not directed to capitalize this property as a business property. He did this on his own. It was listed in Hill's files as a personal residence. Of the homes in Casa Grande, 688 W. Rambler Court was used as a personal residence. The deduction of $7,245 was not fraudulent but mistakenly characterized under this residence. The expenses were not related to this residence, but they were related to the business and were deductible business expenses. The other home, located at 682 W. Rambler Court, was not used as a secondary residence. It was used as a home office, and subsequent defense investigation supported this fact. Thus, the depreciation as well as the taxes and expenses for that property were lawfully deducted.

¶ 15    **Of two homes in Westport, Washington, investigation revealed Bee's wife, Robin, inherited a home in Westport in 2009. The Bees also purchased the house next door and an adjoining empty lot during subsequent years. During 2011, the Bees had one of the residences demolished and contracted with a construction company to build a new residence. Bee told Hill this was an expansion of Bee Line. The income was in cash receipts which were comingled with other Bee Line income. Bee did not keep track of the exact income earned. There was nothing to substantiate business activity took place at either Washington residence. It appears they were used as secondary residences/vacation properties. During the audit, Bee provided documentation to Hill which reflected the Washington properties were Bee Line business locations. Bee caused the utilities and property tax payments to be expensed and deducted on Bee Line's tax returns. As a result of Bee's actions, personal expenses related to both homes were fraudulently deducted on Bee's federal income tax returns as follows: $218,070.97 in tax year 2011 ($214,145.49 of this was construction costs paid to a construction company and expensed as repairs and maintenance); $72,103.20 in tax year 2012 ($63,468.43 in construction costs paid to the construction company and expensed as repairs and maintenance) and $9,056.65 in tax year 2013.**

The building expenses for these properties was mistakenly included on the tax return under repairs when it should have been capitalized. Of note, only a portion of the building expenses were included on the tax return. Although the initial plan was to have a joint business and residence on the property, it never materialized. A transportation business was operated from that property for a short period of time, but that business failed. After the failure of the business, the home was rented to a Commander of the U.S. Coast Guard and was an investment property until it was eventually sold in 2021. It was not used as a secondary residence or a vacation property. It was used as an investment property. In Hill's statement, he acknowledges responsibility for the error. "Hill recalled setting up the Washington State capital assets on the Bee Line depreciation schedule." Memorandum of Interview of Jeffrey Hill, p. 3 of 5, Bates No. 20825. However, having said that, the building expenses should not have been deducted on the federal income tax returns, and that error has been acknowledged and included in the tax computations for the agreed-upon tax loss for the three years.

¶ 16    **Two more properties in Tucson were utilized by Bee to defer $178,715 of capital gain income from his 2011 tax return in a fraudulent 1031 Exchange. During the first audit interview in March 2014, Bee told the IRS one of the properties was a Bee Line bus yard which had been condemned. During 2010, Tanque Verde Unified School District (TVUSD) filed a complaint in condemnation to obtain the property via eminent domain. In February 2011, TVUSD and Evergreen Mountain, LLC, reached a settlement by which TVUSD agreed to pay Evergreen Mountain, LLC, $405,000 in just compensation for the property. This was the property given up as part of the fraudulent 1031 Exchange affected by Bee during the 2011 tax year. It should be noted that in 2009 Bee had Evergreen Mountain, LLC, created with the help of his attorney, Smith. Evergreen Mountain, LLC, is an entity for tax purposes and according to Bee, was created to shield his assets after his life was threatened due to his position as a Pima County Justice of the Peace. According to Bee, his assets are owned by Evergreen Mountain, LLC.**

There was no fraudulent 1031 exchange. However, there was inept accounting by tax preparer Hill. It was a § 1033 condemnation exchange (which has much more favorable requirements for the taxpayer), but, apparently, his tax preparer did not know the difference. The property should have been listed as a § 1033 condemnation exchange, and had Hill done that properly, there was sufficient property of Mr. Bee that fulfilled the IRS requirements for deferral of capital gains. The government, quite reasonably and currently, when this information was provided to it, agreed to delete the allegation of loss of capital gains in 2011 from its computation. Thus, the government suffered no tax loss on this exchange, and any capital gains loss has been particularly excluded from Mr. Bee's current tax liability. Although the taxpayer is ultimately responsible, this mistake is directly the responsibility of the tax preparer, Hill, as it could have been done correctly and would have been done correctly by any competent tax preparer.

**¶ 17** **The other Tucson property described to the IRS as a bus yard in March 2014 was a 4,000+ square foot luxury home in a private and gated community. Bee also purchased two vacant lots adjacent to this home. Bee told the IRS he bought one of the lots to build a separate 4,000 square foot garage with two large bays and equipment for repairing vehicles. He also said 2,000 square feet of the house was used solely as a business office although his family had slept in the house on occasion. When asked about the improvements made to the property, Bee said a pool, ramada, and landscaping were installed for Bee Line employees to use. Witness statements revealed the home was not used as a Bee Line business location and appeared to be the Bees' primary residence from December 2010, when the Bees purchased it, until at least April 2015 when the IRS served the summons to them at the property.**

This property, located at 4045 S. Saguaro Monument Place, contained a home that Mr. Bee bought at a large discount. He never lived on this property, and the property was used initially as an office and then later became an investment rental. Members of the Bee

family only slept in the house a handful of times. It was never used as a residence. However, on the same property, he built a separate 4,000 square-foot garage/warehouse with two large bays and equipment for repairing buses. The garage/warehouse that was built on the property at 4045 S. Saguaro Monument Place was not built for any personal vehicle collection. A visit to that garage/warehouse or a discussion with the individual who built the garage/warehouse, Tim Staring of TRS Custom Builders, would demonstrate that the size of the garage/warehouse and the depth of the concrete flooring were particularly built to house buses and accommodate the repair of buses. The repair and maintenance of buses was, from the onset, the primary use of the garage/warehouse. A visit to the premises, with even a cursory observation, demonstrates the business-related use. There is a portion of the garage/warehouse that could house personal vehicles, and on occasion personal vehicles were housed there. However, the overwhelming use of the entire garage/warehouse was and is used for a business-related purpose. That was the reason it was built on the property, and that has been its use since it was constructed. Although the home with an attached garage on the property has been used as an investment property, the garage/warehouse was particularly excluded from any rental agreements and was used almost exclusively and entirely for bus maintenance, repair, and storage. The other two lots were purchased as buffers from other properties in the neighborhood so that when buses were driven into the garage, there would be minimal visual and/or noise disturbances to the neighbors. The other lots were not part of the case and were not deducted or depreciated. There was no credible evidence that the home was used as a personal residence, which is not unusual since it was not. Additionally, Mr. Bee would not have told the IRS that the lots were purchased to build the garage/warehouse,

as that was never the plan. At worst, there was a misunderstanding. The two surrounding lots were purchased mere months before the construction of the garage/warehouse was complete. At all times since their purchase, the lots have been used as a buffer between his property and other residential lots in the subdivision.

**¶ 18    Bee further benefitted by having Bee Line incur $295,285.92 in expenses during 2011 related to the purchase of custom window coverings, the installation of a custom pool and spa, a ramada, custom concrete work, and landscaping as well as mortgage, taxes, and insurance payments which were deducted on Bee's tax return as Repairs & Maintenance-General, Other Expenses-Lubricants, and Insurance-Other than Health. In 2012, Bee caused Bee Line to incur $136,105.86 in expenses related to improvements made at the Tucson property which were deducted on the tax return as Repairs & Maintenance-General and Insurance-Other than Health. Finally, in 2013, Bee Line incurred $28,605.59 in expenses for the payment of the mortgage, insurance, and property taxes which were deducted on Bee's 2013 tax returns as Insurance-Other than Health and Interest-Mortgage and Taxes & Licenses.**

It was determined in the course of this investigation that there were expenses that related to the building of a pool, ramada, and custom concrete work that were erroneously included as repairs and maintenance and should not have been deducted. These costs should have been capitalized and not expensed, as they were improvements to a business/investment property. A significant error occurred when the bookkeeper entered the expenses for Pioneer Pools into QuickBooks, which should not have been done. However, when she entered Pioneer into QuickBooks, they were entered under Pioneer Distributing through autofill, and that error was not caught by anyone, including Hill, despite the fact that it raised the lubricant expense for the business tenfold and was obviously wrong. Mr. Bee acknowledges these errors and that they are part of the taxes owed. This was simply a mistake. Additionally, the

custom window covers should have been capitalized rather than deducted. At no time did Mr. Bee enter any expenses into QuickBooks.

¶ 19    **During the initial audit interview in March 2014, Bee told the IRS he owned a 1930 Model A, 1995 Chevy Camaro, 2001 Ford Excursion, and 1975 Ford Pickup. Arizona Department of Transportation records revealed Bee had more than three vehicles registered in his name during the period of investigation. These vehicles included one motorhome, high performance sports cars, and classic collector cars. He paid a company in Iowa a total of $85,408.59 to restore a 1953 Plymouth Suburban between October 2011 and January 2013. The restoration expenses were deducted from Bee Line's Schedule C over tax years 2011, 2012, and 2013. He purchased a 2008 Ford Mustang Shelby GT500KR, a 2012 Ford Mustang Boss 302, a 2012 Ford Mustang GT Boss 302, a 2013 Ford Mustang Boss 302, a 2003 Porsche 911 Carrera convertible, a 2013 Ford Mustang Roush, a 2001 Ford Mustang Shelby Cobra convertible, a 2008 Chevrolet Corvette Z06 ZL1, and a 1968 Chevrolet Corvette coupe with Bee Line funds which were part of Bee's personal car collection.**

Since we do not have a tape recording or transcript of the IRS initial audit interview, we are unable to resolve a difference in memory. Mr. Bee's memory is that the agent asked which vehicles were for personal use. The vehicles mentioned in this paragraph were on the return for the business, and Mr. Bee has acknowledged, relative to the Corvettes, the Mustangs, and the Porsche, those should not have been depreciated and formed the basis for the plea agreement and the underlying acknowledgment in the statement of facts.

¶ 20    **Several witnesses described Bee as an avid car collector. R.S. and M.S. of a Tucson car dealership sold numerous vehicles to Bee, particularly Ford Mustangs, during the IRS investigation. According to the couple, they knew which Mustangs were part of Bee's personal collection because Bee did not get license plates for them. The couple related they personally drove the vehicles to two of Bee's Tucson residences with dealer plates on them. Bee left the original window stickers on the vehicle and the owner's manuals in its original plastic. When the couple, delivered vehicles to one of his Tucson residences, Bee gave them a tour of the 4,000 square foot garage he had built as well as his car collection. Bee showed them how the garage had a separate kitchen and laundry room so he could keep his car towels separate from the household laundry. It**

**should be noted that the cars were titled and insured in Bee's personal name, not under Bee Line.**

If ones goes through all of the vehicles owned by Bee Line Transportation, which was an LLC owned by Mr. Bee and his wife, one will determine that many of the vehicles were titled and insured in Mr. Bee's personal name and not under Bee Line, including service trucks, cars, box trucks, tow trucks, etc. Although perhaps sloppy, it was not illegal or improper to do so, as, essentially, the business was a sole proprietorship. It is correct that vehicles were sometimes delivered to various locations owned by Mr. Bee, including the garage/warehouse. It is correct that the garage/warehouse has a separate small kitchen and washer and dryer so that towels are kept separate from household laundry. The majority of the garage/warehouse opens to two large bays that have been sized to hold buses as well as reinforced concrete to hold the extra weight of buses, all of which is not necessary had the intent been to simply house personal vehicles.

**¶ 21** **Bee furthered the level of his fraudulent activity by purposely misrepresenting his personal vehicles as business assets to Hill. In some instances, Bee would purchase a high-performance Ford Mustang and provide documentation to Hill directing Hill to unknowingly capitalize and depreciate a sports car as a truck or minibus on Bee Line's fixed asset register. One of the most significant fraudulent transactions pertaining to personal vehicles involved Bee's purchase of a 1968 Corvette and a 2008 limited edition Corvette from N.G. for a total of $110,000 using Bee Line funds which were then capitalized and depreciated on Bee Line's fixed asset register as a single 2008 Chevrolet Bus. N.G. initially told the IRS she did not have a bill of sale or any documents. However, several weeks later she sent the IRS a copy of a bill of sale for the sale of a "2008 Chevrolet" for $110,000. During N.G.'s interview in December 2016, she said Bee prepared the bill of sale. She could not explain why the bill of sale only listed one vehicle when she sold two vehicles to Bee.**

*See* responses to ¶¶ 19 and 20. Mr. Bee did include in his list of vehicles provided to Hill Fords and Chevrolets, and it has been acknowledged should not have been included for

20

depreciation. There was never any discussion of the particulars of any of the vehicles, and it was Hill, not Mr. Bee, who changed the descriptions from Fords and Chevrolets to trucks or minibuses on Bee Line Transportation's fixed asset register. Hill at no time sought any clarification from Mr. Bee, nor had any discussion with him as to any of these particular vehicles, nor did he provide any advice as to their eligibility for depreciation. However, Mr. Bee did include them on the list provided to Hill and described them generically and, thus, accepts responsibility as indicated in the statement of facts to the plea agreement.

**¶ 22     In March 2018, Bee purchased a 2006 Fleetwood Expedition Motorhome for $104,763.14 and financed $99,996.26 with Bank of the West. During 2011, Bee made $10,671.83 in monthly payments to Bank of the West from Bee Line's Compass account. During 2012, Bee made $19,070.01 in payments from the same account to Bank of the West. Bee made a total of $67,577.28 in payments to Bank of the West. Of these payments, Bee made a single $1,000 payment from his personal Compass Account and the remaining $66,577.28 in payments were made from the Bee Line Compass Account.**

The motorhome that is discussed in this paragraph was used in the business. As part of the settlement for the tax-loss computations, the parties have agreed that, for 2013, deductions related to the motorhome were acceptable, and in exchange, the defense agreed that the deduction for tax computation purposes for 2011 and 2012 would be excluded. An independent witness, Chris Jimenez, indicated that the motorhome was used as an office and occasionally as a place for Mr. Bee to sleep at the business in Phoenix when necessary for calendar year 2013. Although the defense believed there was similar use of the motorhome at times for previous years, it was unable to document that fact through independent witnesses.

**¶ 23**  **B.S. of a Washington construction company testified that Robin Bee drove the 2006 Fleetwood motorhome from Tucson to Westport, Washington, and lived in it while she managed a new home construction project. At Bee's direction, $7,140.38 in interest expense in tax year 2011, $7,464.71 in interest expense in 2012, and $3,381.82 in interest expense in tax year 2013 related to the motorhome were fraudulently deducted on the Schedule C for Bee Line which were filed with Bee's Federal Income Tax Returns.**

Although the motorhome was driven to Westport, WA, there was an accident prior to its arrival which caused substantial damage. A log from a forest truck went through the front end of the motorhome. It took many months to repair, and after its repair, it was returned to Phoenix and eventually used in the business. Due to its substantial damage and repair, it was not lived in during the building of the Washington property. *See also* response to ¶ 22.

**¶ 24**  **On April 22, 2015, in response to an IRS summons, Bee provided numerous documents to include invoices substantiating the construction of a residence in Westport, Washington, and an invoice substantiating the purchase of a fixed asset suspected of being a personal vehicle fraudulently listed on the fixed asset register as a business vehicle. Upon further investigation of these documents, it was noted some sections of the invoice were intentionally deleted or whited out to disguise the true nature of the expense.**

Mr. Bee did not knowingly submit false documents to the IRS relative to construction of a residence or the purchase of a vehicle. That allegation is to be dismissed as part of the plea agreement. *See* responses to ¶¶ 1 and 4.

**¶ 25**  **Bee gave the IRS a copy of the Westport, Washington, construction company invoice written out to him and his wife in the amount of $54,968.70. This was compared to the construction company's invoice. It was obvious that the address of the home and "PROJECT TITLE: New Home Construction" were deleted. Bee also gave the IRS a copy of the construction company's invoice for him and his wife in the amount of $99,101.89. This was compared to the construction company's invoice and it was obvious that an address in Tucson and "PROJECT TITLE: New Home Construction" were deleted. Bee had previously told the IRS and Hill that he (Bee) had built a bus lot and garage in Westport to expand Bee Line operations. It appears Bee purposefully deleted**

**the address information and project description from the invoices to conceal the true nature of these personal expenses.**

Mr. Bee did not purposely delete address information and project description from the invoices, and this was demonstrated through the interview of the contractor and careful examination of Mr. Bee's checks compared to the invoices he produced to the IRS, which were copies of what he was provided by the contractor at the time of their issuance. *See* responses to ¶¶ 1, 4, and 24.

**¶ 26    Bee also gave the IRS a copy of a Ford Motor Credit loan remittance which appeared to be missing information making it difficult to determine which Bee Line fixed asset the invoice was for. Per Ford Motor Credit records, this loan remittance was for a 2013 Ford Mustang GT 5.0 Roush which was purchased by Bee in August 2012 for $65,259 with a lien amount of $61,009. The vehicle was registered in Bee's name and covered under his personal insurance policy. The vehicle was listed on Bee Line's fixed asset register as Auto #134 Ford 2013. Bee benefitted not only by having Bee Line purchase a $65,259.00 vehicle for his personal use, but also by fraudulently deducting $3,160.00 in depreciation expense in 2012 and $5,100.00 in depreciation expense in 2013. Per K.G. at Ford Motor Credit, the loan remittance provided to the IRS was missing the vehicle model, the VIN #, and the date, description, and amount of the last payment made. It appears Bee purposely redacted this information.**

*See* responses to ¶¶ 1 and 4.

<u>**Adjustment for Acceptance of Responsibility**</u>

**¶ 29    The defendant was interviewed by the probation officer and provided a statement wherein he admitted involvement in the offense. Bee agreed with the factual basis of his plea agreement and indicated he was surprised when the IRS contacted him. After talking with the IRS, he realized Bee Line Transportation, LLC, had outgrown his tax skill. He was busy working and being a father and husband and not paying attention to detail. He filed one tax return for his businesses and he and his wife when he should have filed one for him and his wife, one for Bee Line, and one for Royal Student Transportation. He indicated he has apologized to his loved ones for the pain he has caused them. He related he lost his integrity and will work to get it back. He stated he is not bitter or angry at anyone. He and his sister, Cynthia, remain close. He indicated his**

**business also outgrew Hill's tax skill, and he does not have any ill will toward him.**

When Mr. Bee was discussing outgrowing "his" tax skill – although it had certainly outgrown Mr. Bee's own tax skill – Mr. Bee was specifically stating that Bee Line Transportation had outgrown *Hill's* tax skill, which eventually led to Hill's termination during the pendency of the audit. With the subsequent benefit of forensic review by accountants, Hill's lack of diligence in the preparation of these returns was discovered. This, however, does not remove the responsibility from Mr. Bee for the accuracy of his returns but simply completes the factual picture as to how this occurred.

**PART C. OFFENDER CHARACTERISTICS**

**Personal and Family Data**

**¶ 50    The defendant is the second of six children. His siblings are Cynthia Franklin, 59, a bookkeeper; Tim Bee, 52, a former state senator who builds homes; Keven Bee, 49, who is not employed; Kenneth Bee, 46, a landscaper; and Melinda Bee, 39, a caregiver. Cynthia lives in Tucson and has her own residence. Tim, Kenneth, and Melinda live with Burdette and Jerry. Keven resides in Indiana. The defendant related his siblings contracted COVID-19 and recovered.**

For clarification, Mr. Bee's brother, Tim Bee, works for the Arizona Builders Alliance, but he does not personally build homes.

**¶ 51    The defendant described his childhood as great. His father was a teacher and his mother stayed at home when he was a child. He indicated his mother operated the family's farm before working outside the home. He has lived in southern Arizona for most of his life. When his wife inherited a home in Washington, they began vacationing there.**

Mr. Bee's wife did inherit the home in Washington, which eventually was demolished. A new house was built on the premises as an investment property which was ultimately rented for many years and then recently sold. *See also* response to ¶ 15.

**¶ 54** **In 2015, the Bee family purchased and lived in an 8,000 square foot home on 40+ acres in Vail, Arizona. The real estate was purchased as two separate properties during the IRS audit for $1,400,000. In October 2020, the family moved to San Tan Valley where they purchased a 720 square foot single wide mobile home with two bedrooms and one and a half baths. Bee pays $550 for the space for the home. A virtual home visit was conducted on September 23, 2021, and the home although crowded with Bee and his loved ones is suitable for supervision purposes.**

In 2015, Mr. Bee purchased and lived in a 3,316 square-foot home. This square footage includes that of the screened-in porch. The property does have four additional structures that were built in the late 1800s or early 1900s which were used to house workers when it was a working ranch, and together these four additional structures constitute the remaining 4,684 square feet attributed to the property. The house was, and is, not 8,000 square feet. The house, which was built in 1940, needs considerable work and maintenance. The additional structures are habitable but also need work. Mr. Bee does not have the resources to perform the work and maintenance. It is believed that there is little or no equity in the property. Mr. Bee is currently renting the property but plans to put it on the market for sale. Mr. Bee, his wife, and three of his children have vacated the home and moved into a two-bedroom, single-wide mobile home in San Tan Valley, Arizona.

### Educational, Vocational and Special Skills

**¶ 62** **Bee is fluent in English. He is a licensed Arizona school bus driver and commercial driver. He is also CPR certified.**

Mr. Bee was licensed in 1987. He ran charter buses, vans, Lincolns, and classics. School bus routes and certification began in 1989.

**Employment Record**

**¶ 63** **Bee reported he has owned and operated Bee Line Transportation, LLC, since 1987. However, in Pima County Superior Court Case C20171787, exhibits from Union Distributing which provided Bee with fuel for his bus company reflect Bee established Bee Line Transportation in January 1998.**

Bee Line was established in and operated since 1987, not 1998. *See also* response to ¶ 62.

### Conclusion

The parties, after numerous conferences, including those with the IRS, carefully crafted their plea agreement with the agreed-upon statement of facts, an agreed-upon sentencing range of zero to ten months, and agreed-upon restitution of $214,414.00 in tax loss and $128,719.05 in interest, for a total of $343,133.05. Although this pleading is filed as an objection, in actuality, it is more of a clarification as to contents. Mr. Bee accepts full responsibility as set forth in the plea agreement. This pleading is filed so that the Court will have a full understanding of the defense perspective based on information it has acquired during the four years since the SAR was completed. The SAR did not have the benefit of this information at the time the report was written.

RESPECTFULLY SUBMITTED this 14th day of January, 2022.

PICCARRETA DAVIS KEENAN FIDEL PC

By:   /s/ Michael L. Piccarreta
          Michael L. Piccarreta
          Jefferson Keenan
          *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of January, 2022, I electronically transmitted the foregoing to the Clerk of the Court via the CM/ECF system for filing and emailed a copy to:

**David Zipps, Esq.:  David.Zipps@usdoj.gov**
*Attorney for the United States*

_By: /s/  Melissa Hahn_