PICCARRETA DAVIS KEENAN FIDEL PC
2 East Congress Street, Suite 1000
Tucson, Arizona 85701-1782
(520) 622-6900
Michael L. Piccarreta
State Bar No. 003962
Email:  mlp@pd-law.com
Jefferson Keenan
State Bar No. 013896
Email: jkeenan@pd-law.com
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-01793-001-TUC-JAS (DTF) |
| Plaintiff, | |
| v. | SENTENCING MEMORANDUM |
| Keith A. Bee, | |
| Defendant. | |

The defendant, Keith A. Bee, by and through his undersigned counsel, hereby respectfully submits this memorandum to assist the Court in connection with Mr. Bee's upcoming sentencing on March 16, 2022. Mr. Bee agrees with the recommendation in his Presentence Investigation Report ("PSI") that he be placed on probation for a period of 60 months under the conditions set forth in the report, and that he pay in restitution $214,414 for tax loss plus $128,719.05 for accrued interest to the Internal Revenue Service ("IRS"), for a total restitution amount of $343,133.05.[1]

---

[1] Although Mr. Bee is indigent, he has managed to gather $20,000, which has been placed in undersigned counsel's trust account, to be paid after sentencing as a partial good-faith payment on his restitution obligations.

**Background**

This Court will be imposing sentence on Mr. Bee pursuant to his guilty plea to one count of making and subscribing a false income tax return for tax year 2013 in violation of 26 U.S.C. § 7206(1). This case began in 2014 as a civil audit for tax year 2011 involving Mr. Bee and his business, Bee Line Transportation, LLC. The audit focused on the fact that Mr. Bee had been running non-business expenses through the business' accounts.[2] The IRS investigation expanded into tax years 2012 and 2013. The initial IRS Special Agent Report ("SAR") was finalized on January 3, 2018, and reflected the investigation that occurred prior to that date. Subsequent to Mr. Bee's indictment in September of 2018, the defense began its investigation and retained two court-appointed expert forensic accountants[3] who reviewed the case and key portions of the government's extensive disclosure. In the four years since the issuance of the initial SAR, the facts of the case have been carefully reviewed by the parties. Through diligent efforts, the parties were able to meet and confer, and address matters with the aid of additional information derived from the subsequent investigation into the case, including what are now known to be inaccuracies in the initial SAR. Through these efforts, the parties were able to resolve the case through a stipulated factual basis for Mr. Bee's guilty plea.

---

[2] This, of course, is not illegal (and is, in fact, very common in closely held business entities) as long as the expenses are properly accounted for at the end of the tax year. *See*, *e.g.*, *United States v. Chesson*, 933 F.2d 298, 305 (5th Cir. 1991).

[3] The forensic accountants, Marc Fleischman and Frederick Shaffer, have nearly 90 years of combined accounting experience, and Mr. Shaffer worked for the IRS in various roles for nearly 10 years on tax matters.

The parties, after numerous conferences, including those with the IRS, carefully crafted their plea agreement with the agreed-upon statement of facts, an agreed-upon sentencing range of zero to ten months, and agreed-upon restitution of $214,414 in tax loss and $128,719.05 in interest, for a total of $343,133.05.[4] Within this range, the PSI recommends zero months incarceration with a 60-month term of probation under conditions that will permit Mr. Bee to complete his restitution obligations. As noted in the plea agreement, Mr. Bee has accepted full responsibility for his actions and for the full amount of the agreed-upon tax loss. However, as the Court may have noticed from the parties' recent pleadings, there remain some matters of dispute that do not affect the sentence guideline range or the tax loss calculation.[5]

## I.    This Court Should Impose The Presentence Investigation Report's Recommended Sentence Of Probation.

In recommending probation, the PSI correctly notes that "[t]he history and characteristics of the defendant pursuant to 18 U.S.C. § 3553(a)(1) may be considered by the

---

[4] As a result of the subsequent investigation and consultations, the tax loss figures were reduced significantly. The tax loss attributable to Mr. Bee was reduced for tax year 2011 from $217,531 to $24,884; for 2012, it was reduced from $118,369 to $27,857; and for 2013, it was reduced from $252,050 to $161,673. Thus, the total tax liability after adjustments and corrections is $214,414, a reduction in tax liability of $373,356 from the initial reported tax liability of $587,950. The stipulated factual basis for the plea agreement notes that not all of this tax liability is agreed to be the product of civil or criminal fraud. While acknowledging the tax loss, Mr. Bee believes that, at subsequent civil proceedings, the bulk of the tax loss should be considered non-fraud related.

[5] Mr. Bee has admitted that the tax losses relating to various automobile expenses were fraudulent, but the parties have agreed to defer to another day and another forum whether the additional portions of the admitted tax loss are attributable to fraud. *See* Plea Agreement, p. 13. (Doc. 104).

Court," including the defendant's civic, charitable, public service, and record of prior good works. (Doc. 106, p. 18 ¶¶ 96, 98). The PSI further notes that "Bee's good acts are present to an unusual degree and distinguish this case from the typical cases covered by the guidelines," and further notes that Mr. Bee "has completed charitable service and good works, has been employed since he was a teenager, and has family ties and responsibilities due to his wife's illness." (*Id*.). The facts show that Mr. Bee will be an ideal candidate for probation.

## A.    History And Characteristics Of The Defendant.

18 U.S.C. § 3553(a)(1) requires this Court to consider the history and characteristics of the defendant in determining the appropriate sentence. As the PSI notes, Mr. Bee has an exemplary record of public service and charitable works. He has no criminal history. He has worked essentially all of his life, beginning on his family's farm in Tucson and then working at the age of 12 in his school's print shop. He is a man of faith and has been actively involved in church-related activities. His public service includes serving as an elected representative in the Arizona House of Representatives and Arizona Senate, and as a (non-lawyer) justice of the peace in the Pima County Justice Court. In addition, Mr. Bee has operated Bee Line Transportation, LLC since 1987. (Doc. 106, p. 13).

Mr. Bee's current circumstances thus represent a drastic departure from this history. While Mr. Bee accepts full responsibility for his actions, it cannot be denied that the circumstances of this case involve a massive fall from grace for a dedicated individual. Mr. Bee currently lives in an approximately 720-square-foot, two-bedroom, single-wide trailer with his wife and three of his children, including two minors, aged 14 and 15. Mr. Bee's

wife, Robin, has been suffering the debilitating effects of long-term COVID, and is incapable of living independently or providing care for the minor children. (Doc. 106, p. 12 ¶¶ 54-55). Mr. Bee and the children are therefore required to take care of all of the household duties.

Mr. Bee currently works extensively, many weeks up to 100 hours per week, beginning his day at 4:00 a.m. His many responsibilities include maintaining the business' records, driving multiple bus routes, and filling in on special afterschool and weekend bus trips in addition to his caregiving and childrearing functions at home. If Mr. Bee were incarcerated, he could no longer perform these duties, the business would fail and almost assuredly end in bankruptcy, thus frustrating, if not entirely eliminating, Mr. Bee's ability to pay off his tax obligation in any reasonable time frame, and causing collateral damage to the school districts that rely on Bee Line Transportation to transport their students to and from school.[6]

Mr. Bee's present circumstances are thus quite a departure from his former status and history, as the PSI notes, of extraordinary public service and charitable works. In this regard, it is anticipated that the government may contend that Mr. Bee's background and prior positions of authority should somehow count as aggravating factors. Quite the opposite is true. Indeed, the numerous character letters submitted on Mr. Bee's behalf demonstrate quite clearly that he was highly regarded as a fair, compassionate, and even-handed justice of the peace that litigants respected and, indeed, looked forward to appearing before due to his

---

[6] Despite all of Mr. Bee's efforts in running and maintaining the business, the family's financial fortunes have suffered to the extent that they now partially rely on food assistance from the food bank.

character for treating all people with dignity, honesty, integrity, empathy, and compassion. The authors of these letters on Mr. Bee's behalf also uniformly describe him as being a dedicated family man, committed to his religious faith and helping others.[7] These, of course, are additional factors that this Court can and should consider under 18 U.S.C. § 3553(a)(1).

### B.   Nature And Circumstances Of The Offense.

Under 18 U.S.C. § 3553(a)(1), the Court must also consider the nature and circumstances of the offense. As noted above, this case began as a civil audit of Mr. Bee for tax year 2011. While the audit found no irregularities with the revenue reporting, it did determine that there were non-business expenses that were run through Bee Line Transportation, LLC. Mr. Bee has accepted full responsibility for his conduct and full responsibility for the tax loss set forth in the stipulated factual basis in his plea agreement. That said, as Mr. Bee has previously noted,[8] it is now known that there were some factual errors in the IRS's initial evaluation and report in this matter, resulting in a significant downward revision of the tax loss involved. For example, with the subsequent analysis of defense forensic account experts and consultations with the government's agents, it is now known that the actual tax loss for the 2011 tax year was $24,884. The same is true for tax year 2012, where it was later determined that the actual tax loss was $27,857. Had Mr. Bee

---

[7] The letters submitted on Mr. Bee's behalf are from individuals who know him best, and include members of the clergy, experienced members of the bar, law enforcement officers, and court personnel. While these letters uniformly describe Mr. Bee's kindness to all of those he encounters in the various aspects of his life, of particular note is the decision of Mr. Bee and his wife to adopt a child out of a horrible family environment, and to fully accept him (Kaleb) into their home while raising four children of their own.

[8] (*See* Doc. 114).

been adequately represented in the civil audit, the matter may well have taken a different course.[9]

Despite numerous disagreements in many different areas, the parties were able to reach a mutually acceptable resolution of this case through the stipulated factual basis set forth in the plea agreement. Mr. Bee admitted that he knowingly and willfully overstated Bee Line Transportation's total expenses in order to reduce his tax liability. Specifically, Mr. Bee admitted that the listed business expenses included "personal expenses and the depreciation of personal assets, including payments for and the depreciation of automobiles that were not used in the ordinary course and scope of my business." (Doc. 104, p. 12).[10] Mr. Bee therefore agreed to plead guilty to one count of making and subscribing a false income tax return for the tax year 2013 because "the government could prove that my 2013 Form 1040 understated my tax due and owing because I had knowingly and willfully included personal expenses and the depreciation of personal assets in the expenses of Bee Line…." (*Id*., p. 13). Mr. Bee further admitted that relevant conduct for sentencing purposes would include tax years 2011

---

[9] While the government has taken issue with Mr. Bee's assertions that his tax preparation services and his representation in the IRS audit from his prior accountant, Mr. Jeffrey Hill, was woefully inadequate, the reports prepared by the court-appointed forensic accounting experts set forth in detail the numerous areas in which Mr. Hill's performance fell below minimally acceptable professional standards. Indeed, there can be no reasonable dispute about the quality of Mr. Hill's work in the tax preparation services and in the subsequent IRS audit. Had it been done properly, the matters that were subsequently brought to the IRS's attention could have, and should have, been brought to their attention during the audit. This is not the first time that Mr. Hill's services have resulted in legal consequences for the client. (*See* Doc. 94).

[10] It should be noted that these vehicles were sold long ago and the proceeds were placed in the business' accounts to help keep the business running.

and 2012, "resulting in a total tax loss over these three years of approximately $214,414." (*Id*.). However, the factual basis to the plea agreement further specifies that not all of this total tax loss figure was due to criminal fraud, or even civil fraud, and left those matters to be determined at a later date in another forum. (*Id*.).

The PSI correctly sets forth the terms of Mr. Bee's plea agreement and the resulting sentencing guideline range of zero to ten months. (Doc. 106, p. 18 ¶ 94). The PSI then recommends, within that range, a sentence of zero imprisonment and a 60-month term of probation under the conditions specified in the report. (*Id*., pp. 21-22). However, in describing the offense conduct, the PSI understandably repeated many of the factual assertions set forth in the initial SAR that were later determined to be inaccurate after the examination by the defense forensic accounting experts and consultation with the government discussed above.[11]

Accordingly, Mr. Bee filed his objections to, and comments on, the PSI so that the Court would have the benefit of the subsequent analysis of the case and factual information that was not known to the government at the time of the initial SAR. (Doc. 114). Mr. Bee specifically noted that these factual matters did not affect the factual basis in the plea agreement, the total tax loss figure, or the resulting sentencing guideline range. (*Id*., p. 3).

---

[11] For example, the SAR disallowed over $200,000 of deductions that were actually not deducted by Mr. Bee on his tax returns. This is not to disparage the government agents who prepared the report. The business records and Mr. Hill's accounting records were both inadequate and were not property presented to the government prior to indictment. Nonetheless, the IRS did not catch this error until it was pointed out to them by the defense forensic accountants, and it was erroneously included in its initial disallowed losses.

The government, while also acknowledging that these factual matters "do not affect the tax loss -- which is agreed -- and hence they do not affect the guideline calculation," (Doc. 119, p. 7), nonetheless takes issue with Mr. Bee's characterization of the non-business expenses unrelated to the automobiles discussed above. As Mr. Bee has previously noted, this Court is not required to resolve all disputed matters within the PSI, and may rely instead on the agreed-upon factual basis of the plea agreement.[12] However, because the government has chosen to focus on these matters, Mr. Bee believes that this Court should have the benefit of an accurate characterization of the underlying facts.

The government's discussion of these matters repeats some of the factual inaccuracies that are now known to exist in the initial SAR.[13] As an example of what the government believes to be Mr. Bee's "simply not credible" explanations about these matters, (Doc. 119, p. 2), the government has devoted considerable attention to the "Saguaro Monument" property. However, the government's claims here, too, contain errors.

First, the government claims that Mr. Bee characterized this property as "a bus yard," when it was, according to the government, really a personal residence. (Doc. 119, p. 4). The truth is that the Saguaro Monument property was *never* used as a personal residence for Mr.

---

[12] (*See* Doc. 114, pp. 3-4 and n. 2).

[13] For example, the last page of Exhibit B to the Government's Response to Defendant's Objections to and Comments on Presentence Investigation Report, (Doc. 119, Ex. B, Bates No. 29958), states that the "Total Disallowed Expenses for 2011-2013" are "$1,600,768." This is a mistake of over $900,000 more than the accurate figure for disallowed expenses, which is now known to be $692,309. It is this figure that the stipulated tax loss is based upon, not the larger number. The agreed-upon tax loss of $214,414, which is based on the $692,309 of disallowed expenses, is the relevant figure for guidelines and sentencing purposes, not the government's initial, erroneous disallowed expense number.

Bee or his family. Mr. Bee and his family resided in Casa Grande during this entire period of time.[14] While the property may have been purchased initially as a possible residence, that hope simply never materialized.[15]

Second, the government claims that the reason Mr. Bee characterized this property as a bus yard rather than his personal residence is that "he was trying to conceal a 1031 exchange he effected to defer $178,000 in capital gains for 2011." (Doc. 119, p. 4). It is somewhat surprising that the government would raise this matter because it actually proves several of Mr. Bee's points. It shows the ineptitude of Mr. Hill in characterizing the transaction as a "1031 exchange," when, in reality, proper analysis showed that the property fully qualified for a 1033 condemnation exchange.[16] When the proper analysis was conducted and presented to the government, the government properly withdrew its claim of unpaid capital gain taxes as there was no capital gains loss to the government. Mr. Bee fully qualified for deferment of any capital gains under § 1033. The government now claims that none of this matters because the government's main point is that Mr. Bee "misrepresented

---

[14] Mr. Bee's neighbor in Casa Grande, Tracy Ventura, was interviewed by the defense and can verify that Mr. Bee and his family resided at the Casa Grande property prior to, during, and subsequent to the relevant time periods. This truth is also verified by each and every member of the Bee family that resided in Casa Grande with Mr. Bee. [*See* attached Exhibit A, Inter-State Investigative Services Memorandum, October 5, 2020].

[15] The government, of course, bears the burden of proving by a preponderance of the evidence the facts on this issue, *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir. 2009), but under any standard, the truth is simply that the property was never a personal residence for Mr. Bee.

[16] It is mystifying, but not surprising, why Mr. Hill characterized the matter as a 1031 exchange when, in fact, this property, and other properties, fully qualified for a 1033 condemnation exchange, which would defer any capital gains and is a much more generous provision to the taxpayer.

the character of the property." (*Id.*). But this simply repeats the government's prior mistake as the character of the property was never misrepresented because it was never a personal residence, and the facts show business purposes for which the property was used.[17]

Third, the government contends that Mr. Bee's statements about business expenses related to the property were not credible, and focuses on the expenditures for the custom garage that Mr. Bee "claims" was built for the repair and maintenance of buses. (*Id.*, p. 5). Again, it is surprising that the government would focus on this matter because it is quite evident that everything about the garage shows that it was, indeed, built for bus repair and maintenance and has been continuously primarily used for that purpose since it was built. To begin with, the garage is supported by at least an 8-inch concrete foundation, well in excess of the normal 3- to 4-inch foundation used for ordinary garage purposes, which added considerable yet necessary extra expense to the project. This was necessary as, since the garage was built to perform repairs on buses, an expensive, extra-thick concrete foundation was required to support the additional weight.

The size of the garage also shows that it was built to accommodate large buses, not ordinary automobiles. The government notes that, during a walkthrough inspection, a revenue agent did, in fact, notice the presence of buses in the garage, but the agent remarkably did not think that the garage bore the ear-markings of a genuine bus repair facility. (*Id.*). With

---

[17] In addition, Mr. Bee purchased other properties during the relevant time periods that permitted the condemnation proceeds, under § 1033, to be rolled into other properties and any capital gains deferred. There was no need for Mr. Bee to misrepresent the property, as he had multiple properties that qualified for the § 1033 condemnation exchange.

all due respect to the revenue officer's objectivity, it is painfully obvious to literally anyone who would view this facility that its primary use is bus maintenance. Obviously, theoretically, a personal vehicle could also be housed in the facility, and on occasion, a personal vehicle or vehicles were parked there. However, throughout the overwhelming majority of the time (approximately 95%), the overwhelming majority of the facility (approximately 95%) was used for buses, and such use is obvious. Whether one wishes to call it a bus yard, warehouse, garage, or bus maintenance facility, or some other general term, does not undercut the fact that that was why it was built and that is how it has been used since it was built. The buses, when maintenance was performed upon them, would be pulled into a garage that, not surprisingly, is the exact perfect length to fit two buses while work is being performed in a garage where the doors can be closed and not have any visual disturbance for any neighbors.[18] Mr. Bee is attaching hereto numerous photographs of the garage that clearly demonstrate its purpose as a facility for repairing and maintaining buses. [*See* attached Exhibit B]. Mr. Bee further invites the Court to personally visit the property so that the Court can easily observe for itself the nature and the purpose of the garage.[19] Realistically, this should not even be an issue for the government.

---

[18] Mr. Bee also notes that he purchased "buffer" properties on either side of the Saguaro Monument property in order to minimize the effects on the neighborhood from the buses entering and leaving the property for maintenance purposes. Buses were generally not parked at that location outside of the garage.

[19] Indeed, Mr. Bee previously requested a jury view, (Doc. 76), which the government vigorously opposed, (Doc. 95), so that the jury could observe the clear nature and purpose of the garage. Any such jury (or Court) view would immediately dispel the government's assertion that this garage was not used for business purposes.

Finally, the government questions Mr. Bee's assertions that the Saguaro Monument property was an investment property and that the expenses related to the property should have been capitalized and depreciated, rather than expensed. (Doc. 119, pp. 5-6). The government dismisses these arguments, claiming that Mr. Bee is simply trying to minimize "his culpability for what he did: use Bee Line Money to acquire, renovate, and maintain multiple single-family homes." (*Id*., p. 6). However, once again, the government neglects the fact that it is perfectly legal (and quite common in closely held business entities) for business funds to be used for such purposes unrelated to the business, as long as the expenses are properly accounted for at the end of the tax year.[20] It is also perfectly legal to depreciate real property, including homes that are used for a business purpose or a rental, as this property was (and is) used. Of course, these expenses were not properly reclassified to capitalization and depreciation from deductible expenses in the present case. That is one of the reasons Mr. Bee agreed to resolve the case through the agreed-upon factual basis set forth in the plea

---

[20] As explained in *United States v. Chesson*, 933 F.2d 298, 305 (5th Cir. 1991):

> There was a great deal of testimony as to the proper timing and method of reclassifying non-business expenses. Most of the testimony confirmed that a corporation's accountants can, and should, reclassify personal and other non-business expenses at the end of the tax year to minimize the client's tax obligations. There are several options. A personal expense may be reclassified as additional compensation to the shareholder, as a loan payable by the shareholder, or as a constructive dividend to the shareholder.

agreement.[21] However, it is inaccurate and incorrect for the government to contend that the use of business money for non-business expenses is, in itself, unlawful, evidence of unlawful intent, or evidence of "culpability." (*Id.*).

The government is certainly correct that "what the Court need not do is delve into the minutiae of the accounting issues because they do not affect the tax loss -- which is agreed -- and hence they do not affect the guideline calculation." (Doc. 119, p. 7). However, because the government has devoted so much of its response to this "minutiae," and cited the Saguaro Monument property as an example, Mr. Bee felt it necessary to address these matters to correct the government's errors and present an accurate portrayal of the underlying facts.

In sum, Mr. Bee has accepted full responsibility for his conduct as set forth in the agreed-upon factual basis for his plea agreement. The agreed-upon factual basis accurately sets forth the nature and circumstances of the offense for sentencing purposes.

### C.     Addressing The Purposes Of Sentencing And Restitution.

In determining the appropriate sentence, this Court must also consider the need for the sentence imposed to address the purposes of the sentencing statutes, including providing just punishment and protecting the public from future criminal conduct from the defendant. 18 U.S.C. § 3553(a)(2). The PSI correctly notes:

A five-level downward variance is recommended to an imprisonment range

---

[21] The home, itself, was never used as a personal residence but, for a time it was used as an office for the business because it was available. Subsequently, for over five years, as an investment property, the home has been rented with the caveat that the bus yard/garage is still to be used only by the business. Thus, those expenses that were used to improve the residential property could have been capitalized and depreciated. Where they were expensed, they are now part of the agreed-upon tax loss.

of zero to six months. The lower end of that range, zero months, is recommended and *a 60-month probation term is believed to represent an adequate sanction which addresses the purposes of sentencing and payment of restitution*. The recommended term of probation will serve to monitor Bee's activities. The defendant must pay restitution. Due to his owing restitution, he does not have the ability to pay a fine, and it is recommended the fine be waived.

(Doc. 106, p. 21, emphasis added). Mr. Bee submits that the PSI is correct and the recommended sentence of probation serves the purposes of the sentencing statutes and comports with the Court's duty to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of the sentencing statutes. 18 U.S.C. § 3553(a).

Despite the PSI's well-supported reasons for its recommendation of probation, it is anticipated that the government may contend that, in any tax prosecution, a term of imprisonment must be imposed. This position would reflect the U.S. Attorney's Office's general policy of recommending (except in extremely limited circumstances) a sentence of imprisonment in every single tax case, regardless of the circumstances of the offense and the history and characteristics of the offender, usually followed by a press release.[22] This policy, of course, stands the traditional concept of individualized sentencing on its head. As with any other offense, not all offenders are alike, and not all offenders deserve the same punishment. *See*, *e.g.*, *United States v. Bragg*, 582 F.3d 965, 968 (9th Cir. 2009) ("Each case of sentencing is a unique case"). The task before the Court is to determine the appropriate sentence to be imposed on *this* particular defendant in *this* particular case.

---

[22] "Normally, the government attorney in a tax case should not recommend that there be no period of incarceration." Department of Justice, Criminal Tax Manual, 43.12 [1].

In recommending incarceration in tax cases, the government also often refers to the sentencing guidelines and related commentary concerning tax offenses. However, the U.S. Probation Office is certainly as familiar with these provisions of the guidelines as the government is. The PSI in the present case, after considering all of these policy considerations, the guidelines, and the statutory sentencing factors, nevertheless correctly recommends a sentence of probation.[23]

In fact, the plea agreement in this case sets forth the government's acknowledgement that a sentence within the range of zero to ten months would be appropriate, and therefore recognizes that a sentence of probation could be an appropriate sentence to be imposed on Mr. Bee. In this regard, the fact that the sentencing laws for certain other offenses deprive the Court of its traditional sentencing jurisdiction, which sometimes results in over-punishment and over-incarceration for certain offenders and thereby wrongly creates disparate sentencing treatment for those offenders, should not mean that the Court should be required to punish and incarcerate others, especially when the government has agreed, unlike in some of those cases, that the Court has the authority to exercise its traditional sentencing discretion, including imposing a term of probation. One would hope that a 56-year-old first offender with no criminal background, a lifetime of public service and exemplary charitable works, who has significant family and business responsibilities to attend to, and who has

---

[23] Of course, all of these factors must be considered against the backdrop of "the over-incarceration crisis in the federal criminal justice system today," *United States v. Dokmeci*, 2016 U.S. Dist. LEXIS 30404, *2, 2016 WL 915185 *1 (E.D.N.Y. 2016) (Gleeson, J.), and the court's over-arching obligation to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of the sentencing statutes. 18 U.S.C. § 3553(a).

already incurred substantial adverse consequences as a result of this case, would be given consideration by the government at sentencing.

In sum, a review of the applicable sentencing statutes, guidelines, and policies shows that the PSI is correct in recommending a sentence of 60 months' probation for Mr. Bee, under the conditions set forth in the report. This case involves a significant number of mitigating sentencing factors under § 3553, including Mr. Bee's lack of criminal history, exemplary employment record, family ties and responsibilities, extraordinary charitable service and good works, longtime ties to the community, remorse and acceptance of responsibility for his conduct, the special circumstances arising from his spouse's medical condition and needs, the fact that there is clearly no need to protect the community from any further criminal conduct, and the fact that Mr. Bee has suffered considerable collateral and financial consequences as a result of his actions.

There are also additional collateral consequences that the Court may properly consider. Mr. Bee was required to resign and retire as a justice of the peace as a result of his indictment. His bus company providing transportation to children to school was one of the industries hardest hit by the pandemic, and Mr. Bee would have clearly qualified for forgivable PPP loans in the hundreds of thousands of dollars to assist the business, but was not able to apply for those loans. The IRS has placed a lien upon Mr. Bee's judicial pension, seizing $4,249.31 each month from his $7,230.68 monthly benefit, leaving a balance from which insurance costs of $1,935.54 are also deducted. Mr. Bee also is facing the possibility of a fraud penalty of 75% of the tax loss of $214,414, in the event the IRS determines that

the fraud penalty is applicable.[24] The burden of caring for his wife will no longer be carried by Mr. Bee but will need to be carried by his children, as there are no funds for caregivers. Finally, as noted above, Mr. Bee's incarceration will almost surely signal the demise of his business and force him into bankruptcy, requiring Mr. Bee to essentially find a new way to start over in life, at an age when it is not so easy to do so.

Mr. Bee is a good person. He made mistakes for which he is paying, and will pay, the price. His pension, which he earned, is now down to $1,045.83 per month. He works extensively to try to keep the bus company alive. He has reduced his lifestyle to a single-wide trailer for him, his wife, and three of his children. He and his children provide needed assistance to his wife due to her medical issues. They subside, in part, on food from the food bank. His reputation is in tatters, but for the people that really know him and his character and his ability to work hard, there is an understanding that this act does not define him. He is in a deep financial hole, and there is a possibility of bankruptcy. He is willing, if the Court permits, to continue to work as hard as possible, and hopefully with the pandemic turning into an endemic, he can make the bus company survive and pay his debts. Without Mr. Bee working his extraordinary hours, the bus company cannot survive. The charges in the indictment occurred some 8 to 11 years ago, when Mr. Bee was working full-time, while attempting to maintain and run his transportation business along with his outside volunteer and charitable work. He carries with him, and it weighs heavily upon him, that his actions

---

[24] For anyone with a working knowledge of the IRS, it is safe to assume that the IRS will attempt to impose the fraud penalty to the fullest extent possible.

have caused deep embarrassment in numerous ways and severely impacted his family and the numerous people who care about him. Foremost, there is a strong emotion of self-disappointment. Although Mr. Bee is responsible for his own problems, his problems would have been mitigated had his accountant performed his tax preparation and civil audit duties in a competent, professional manner. There is some light at the end of this tunnel, and if he is permitted to be released and continue working, he has, at least, a chance to pull himself out of these financial problems and also regain the respect of his community. Regardless of the Court's sentence, Mr. Bee has already been punished severely for his transgressions and requests the opportunity to show to the Court, his family and friends, and the community that he can pick himself up, make full amends, and continue on with his life as a good citizen of this community.

Accordingly, it is requested that the Court enter its order in accordance with the plea agreement and conclude that a 60-month term of probation is appropriate under the conditions set forth in the PSI, including full payment of the tax loss restitution.

However, if the Court, after considering all of the relevant statutory factors and sentencing considerations, determines that a sentence of incarceration must be imposed, Mr. Bee respectfully requests that he be permitted to voluntarily surrender,[25] and that he be placed in the United States Penitentiary ("USP") Tucson Satellite Prison Camp, in order to facilitate continued contact with his family members.

---

[25] The PSI correctly notes that Mr. Bee "is viewed as a good candidate for voluntary surrender, has kept all court appearances, and is not viewed as a flight risk or a danger to the community." (Doc. 106, p. 21).

1

RESPECTFULLY SUBMITTED this 9th day of March, 2022.

2

PICCARRETA DAVIS KEENAN FIDEL PC

3

4

By:   /s/ Michael L. Piccarreta
          Michael L. Piccarreta

5

          Jefferson Keenan
          *Attorneys for Defendant*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of March, 2022, I electronically transmitted the foregoing to the Clerk of the Court via the CM/ECF system for filing and emailed a copy to:

**The Honorable James A. Soto:  soto_chambers@azd.uscourts.gov**

**Gabriela Ma, Judicial Assistant:  gabriela_ma@azd.uscourts.gov**

**Wendy Cotner, U.S. Probation:  wendy_cotner@azd.uscourts.gov**

**David Zipps, Esq.:  David.Zipps@usdoj.gov**
*Attorney for the United States*

<u>By: /s/  Melissa Hahn</u>

EXHIBIT  A



P.O. Box 40763
Tucson, AZ 85717
www.iisaz.com

**Inter-State**
INVESTIGATIVE SERVICES
The Information Edge! ®

1-800-729-0311
(520) 882-2723
(520) 882-2617 FAX

## <u>MEMORANDUM</u>

**TO:** Michael L. Piccarreta, Esq.                              Via Email

**ATTN:** Melissa Hahn

**FROM:** Lisa Budisavljevic

**DATE:** October 5, 2020

**SUBJECT:** Bee

**OUR FILE #:** 200220

<u>**PRIVILEGED AND CONFIDENTIAL**</u> – Prepared at the request of counsel in anticipation of and in connection with pending litigation –
Subject to attorney/client privilege and work product protection.

On September 10, 2020 I spoke telephonically with Tracy Ventura, (520) 450-1235, who resides at 689 W. Rambler Ct., Casa Grande, AZ., the property next door to Keith Bee's former home, 688 W. Rambler Ct., Casa Grande, AZ.

Ventura stated she "remembered the Bee family well" and recalled that she and her family moved into their home in 2007, around the same time the Bee family moved into their residence. Ventura said the neighborhood was new at the time and "her family and the Bee family were some of the area's first residents."

Ventura said she often saw Mrs. Bee in the front of 688 W. Rambler Ct. "planting plants and flowers" and frequently observed the Bee children in the yard. Ventura indicated that she also "regularly spoke" with Bee family members when they would see each other outside.

Ventura advised that she was aware that the Bee family owned both 688 and 682 W. Rambler Ct. but did not know how the family used the property at 682 W. Rambler Ct. However, Ventura stated that she did "commonly see charter buses parked in front of the property."

According to Ventura, her house caught fire sometime in 2018 and she and her family moved away for a year. Ventura stated that she could not remember whether the Bee family sold the two properties on W. Rambler Ct. prior to the fire or while she was living elsewhere.

Ventura described the Bee family as "friendly people and good neighbors." Ventura indicated that although she and the Bee family were neighbors, she was only

AZ DPS License # 1002154



acquainted with them and did not know them well. However, Ventura said that she knew the family well enough to know that they did live in the home located at 688 W. Rambler Ct. full time from 2007 until they sold the homes around the time her home caught fire in 2018.

# EXHIBIT  B














































