GARY M. RESTAINO
United States Attorney
District of Arizona
David R. Zipps
Assistant U.S. Attorney
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: david.zipps@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>   Plaintiff,<br><br>   vs.<br><br>Keith Allan Bee,<br><br>   Defendant. | CR 18-1793-TUC-JAS (DTF)<br><br>GOVERNMENT'S SENTENCING MEMORANDUM |

> *A judge shall comply with the law, including the Code of Judicial Conduct.*
>
> *A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.*
>
> *Public confidence in the judiciary is eroded by improper conduct and conduct that creates the appearance of impropriety. This principle applies to both the <u>professional and personal conduct</u> of a judge.*

17A A.R.S. Sup.Ct. Rules, Rule 81, Code of Jud. Conduct, Rules 1.1 (Compliance with the Law), 1.2 (Promoting Confidence in the Judiciary) (2011) (emphasis added).[1]

\* \* \*

---

[1] "'Judge' means any person who is authorized to perform judicial functions within the Arizona judiciary, including a justice or judge of a court of record, a justice of the peace, magistrate, court commissioner, special master, hearing officer, referee, or pro tempore judge." 17A A.R.S. Sup.Ct. Rules, Rule 81, Code of Jud. Conduct, Terminology (2011).

This is a sobering case. In the early 2010s, Keith Bee, a former state senator and sitting judge who was subject to a code of conduct in both his professional and personal life decided he was no longer willing to pay the federal taxes he owed. Judge Bee, who enforced the rule of law by day, disregarded it at night, running over $1 million dollars in disallowed personal expenses and the depreciation of personal assets through the books and records of his company, Bee Line Bus Transportation, LLC. Judge Bee then caused these records to be forwarded to his return preparer for use in the preparation of his Form 1040s for 2011, 2012, and 2013; by doing so, he caused the preparation of three false tax returns that substantially understated his taxable income because he had artificially inflated Bee Line's expenses, thereby reducing Bee Line's profits that would have otherwise shown up as taxable income on his returns. Knowing the returns were false, Judge Bee then signed a Form 8879 each year under the penalties of perjury stating that the returns and accompanying schedules were "true, accurate, and complete."

In 2018, Judge Bee was indicted on three counts of making and subscribing a false income tax return; the Indictment alleged that for each year from 2011 to 2013, Schedule C to his Form 1040—used by taxpayers for listing the "Profit and Loss for a Business"—overstated his bus company's total expenses in a material amount because he had included in those figures personal expenses as expenses of the company. On August 27, 2021, defendant pleaded guilty to Count 3 of the Indictment for making and subscribing a false tax return for 2013; he also admitted to "similar activity for tax years 2011 and 2012" that cheated the government out of $214,414. Plea Agreement at 13 (Doc. 104).

In determining an appropriate sentence for this conduct, the Court must consult the U.S. Sentencing Guidelines, which, as noted in the Presentence Investigation Report, call for a term of 12 to 18 months' imprisonment based on the tax loss here. *See* Presentence Investigation Report ("PSR") at 20 (guideline range is 12 to 18 months based on a total offense level of 13 and a criminal history category of I). Considering this range and the facts of this case, the parties entered into a plea agreement in which they stipulated to a one-level variance, reducing the 12- to 18-month range to 10 to 16; they also agreed to

limit any term of imprisonment to 10 months and to give defendant the opportunity to argue for probation. The resulting plea range is 0 to 10 months.

The government believes the Court should sentence defendant to between 8 and 10 months in prison, a sentence towards the top of the plea range but two to four months below the 12- to 18-month guideline range. A prison term of this length is simply compelled given who defendant is, what he did, and the need for the sentence to satisfy the objectives in 18 U.S.C. § 3553(a).

A.   The Offender and the Offense

What truly resonates about the criminal conduct in this case is the repeated acts of dishonesty by someone who not only knew better, but was obligated by an ethical code to act better, and had no need whatsoever to cheat. Keith Bee was a wealthy man who worked as a judge and owned a bus company that had multimillion dollar gross receipts during the years in issue. And despite his willingness to take taxpayer money to provide school bus transportation in Tucson and around the state, he refused to pay his fair share of the taxes he owed on the profits he made. Then, when the IRS came calling to conduct an audit in 2014, defendant didn't come clean, and he didn't offer many explanations he is offering now. Instead, he doubled down, providing false and dubious information to the IRS revenue agent during the audit to conceal his misdeeds.[2]

On the facts of this case, just punishment can only be achieved with a prison sentence; indeed, it would be unseemly to have a justice system in which a person who had defendant's advantages didn't have to go to prison when people without those advantages routinely do. This conclusion follows not just from the magnitude of the loss

---

[2] *See* Government's Response to Defendant's Objections to and Comments on Presentence Investigation Report at 4-5 (02/17/22) (during audit, defendant claimed that a luxury home on the east side of Tucson was actually a bus yard, that a pool he added and deducted as an expense of his bus company was built for use by employees, and that a Mustang Cobra parked in the garage on the property was used to drive undercover to check on buses in service); *cf id.* at 6 (in a 2010 loan application with a warning above his signature that a false statement on the application was a felony, defendant stated he intended to use Saguaro Monument as a primary residence, contrary to his current claim that Saguaro Monument has always been a business or investment property).

and the relevant guideline range, but from the specifics of what defendant did and the length of time he was doing it. This was not some crime of passion or aberrant behavior; it was repeated and concerted activity over a period of years. Defendant put more than $1 million of expenses on Schedule C that did not belong there, including the costs to purchase, improve, or maintain four single-family homes in Tucson and one in Westport, Washington, and the depreciation of multiple high-performance cars in his personal car collection, including several Ford Mustangs, a Chevrolet Corvette, and a Porsche. *See* Government's Response to Defendant's Objections to and Comments on Presentence Investigation Report ("Govt. Resp.") at 4-5 (02/17/22).

In the face of these all these disallowed expenses, defendant has sought to minimize his conduct, claiming that while he did depreciate his personal car collection as an expense of his bus company, and he did so willfully, the balance of the disallowed expenses resulted from his "lack of focus, supervision, and negligence in the operation of his business accompanied by ineptitude by his tax preparer." Defendant's Objections to and Comments on Presentence Investigation Report (01/14/22) (Doc. 114) at 9-10. But these efforts to minimize his conduct and to point the figure at his return preparer are simply unavailing. As a threshold matter, defendant makes no claim that the costs associated with the five single family homes were properly deducted as expenses of his bus company. Every dime of that money has been disallowed in calculating the agreed tax loss. He also makes no claim that he provided his return preparer with complete and accurate information and simply relied in good faith on his advice. And he also makes no claim that he ever even discussed with his return preparer whether expenses associated with the purchase, renovation, or improvement of five single-family homes were "ordinary and necessary" expenses of his bus company, or whether there were circumstances in which he could depreciate them as expenses of his bus company and list those expenses on Schedule C. Instead, he did the same thing he did with expenses regarding the depreciation of his personal car collection: he just folded them into the information he provided his return preparer about company expenses, knowing they

would increase the expenses that landed on Schedule C and dramatically reduce his bus company's profitability.

Given the offense to which defendant has admitted and the facts that underlie it, it is abundantly clear that, when it comes to taxes anyway, defendant was neither honest nor genuine; instead, he was dishonest and fake.  *See* Bennett, THE BOOK OF VIRTUES at 599 (Simon & Schuster 1993) (contrasting the different characteristics of honest and dishonest behavior).  Defendant lived in the dark and sought to conceal—and he sought to keep his return preparer in the dark, too.  Now that it is time to face the consequences, defendant continues to deflect, claiming that he wouldn't have been such a big cheat if his return preparer had done a better job.  But this claim is just avoidance.  Defendant's fate here is entirely his own; despite anything he claims his return preparer did, had defendant been honest, we wouldn't be here now.

       B.       Other Sentencing Considerations

The plea agreement in this case provides for a range of imprisonment from 0 to 10 months, a downward variance from the guideline range of 12 to 18 months that permits defendant to argue for probation.  On the facts of this case, however, a prison sentence is required for the Court to impose a sentence that satisfies the requirements § 3553(a).  A brief review of the history of the relevant sentencing considerations at issue explains why a prison term—even a below-guideline range like the 8 to 10 months sought be the government here—is so important on the facts of this case.

When passing the Sentencing Reform Act in the 1980s, Congress addressed a growing concern that too many white collar defendants were being placed on probation; it noted that "[t]he placing on probation of [a white collar criminal, including a "tax violator"] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact."  S. Rep. No. 98-225, at 91-92 (1983).  Here, there is no need to rehabilitate defendant; rather, the deterrent and punitive impacts

of any sentence to be imposed are of paramount concern. In such circumstances, a sentence of probation would be "grossly inappropriate," just as Congress observed.

Consistent with Congress's observations, the Sentencing Commission has also noted the serious nature of white-collar crime and the "significant deterrent" effect of prison terms in cases like this one:

> Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses, insider trading, fraud, and embezzlement, that in the Commission's view are "serious."
>
> The Commission's solution to this problem has been to write guidelines that classify as serious many offenses for which probation was previously frequently given and provide for at least a short period of imprisonment in such cases. The Commission concluded that the definite prospect of prison, even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.

U.S.S.G. § 1A1.1, Ch. 1, Pt. A.4(d). After noting the "significant deterrent effect" of prison terms in cases like this, the Sentencing Commission also emphasized the particular importance of deterrence in tax prosecutions in its introduction to Part T of Chapter 2, which contains guidelines specific to tax crimes:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax laws. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines . . . .

U.S.S.G. §2T1.1, Introductory Commentary. These sentiments by the Sentencing Commission, which echo the concerns of Congress, have also been echoed by the Courts. As the Fourth Circuit has stated,

> Given the nature and number of tax evasion offenses compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is

- 6 -

> wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010).

Despite the compelling case that can made for an 8- to 10 -month, below-guidelines prison term on the present facts, the probation officer has recommended a five-year term of probation. In light of the contents of the PSR, it is a difficult recommendation to understand. As the probation officer stated,

> The instant offense is egregious and was caused by greed. Bee has an education, a successful transportation business, money, and means but his desire to own real estate and collect vehicles caused him to disregard the law when he was the enforcer of laws as a Pima County Justice of the Peace. He and his wife had an extravagant lifestyle while he defrauded the United States. Bee violated his obligations to the community he took an oath to serve. He shattered his reputation for homes and cars.

PSR at 20. Given these statements, the requirements of § 3553(a), and the authorities noted above, one would think a term of prison would be the natural recommendation that followed. The probation officer went in a different direction, however, placing undue weight on a discouraged sentencing factor, and conducting an abbreviated analysis when considering that factor that does not support a sentence of probation here.

The probation officer appears to have placed significant reliance on defendant's good works; in discussing a possible departure, she states that defendant's "good acts are present to an unusual degree and distinguish this case from the typical cases covered by the guidelines," and in discussing a possible variance, she notes that defendant "has completed charitable service and good works . . . ." *Id.* ¶¶ 96, 98. Finally, in the recommendation section, she observes that defendant "completed charitable service and good works prior to his fall from grace." *Id.* at 21.

In discussing a possible departure based on defendant's good works, the probation officer does note that good works and charitable acts "are not ordinarily relevant in determining whether a departure is warranted," and she ultimately opts for a variance, not

- 7 -

a departure to arrive at a recommendation of probation. But in concluding that a variance to a sentence of probation is appropriate based on good works, she never addresses the implications of good works being a discouraged sentencing factor under the guidelines, and why a variance to impose a sentence of probation would be appropriate if turned out that a departure to impose a sentence of probation would not.[3]

As the Sentencing Commission has noted, while good works are discouraged as a basis for imposing a sentence outside the applicable guideline range, they may be relevant in "exceptional cases." U.S.S.G. §5H1.1, Introductory Commentary. Reviewing the PSR, it is not clear what would make this an exceptional case. There are some indicia of good works, but no analysis of those works in light of defendant's wealth and privilege, and what it is about defendant's good works that make this an exceptional case. And without anything exceptional present, it is just not clear what would change this case from one that would require a prison term to one in which a term of probation would do.

Here, moreover, there is an additional issue, and that is how any good works actually cut. Like his status as a judge, the argument can be made that defendant's good works should actually cut the other way; it is entirely reasonable to conclude that, on the facts here, they should be considered more in the nature of aggravating circumstances than mitigating ones. Defendant was a judge subject to an ethical code who enforced the law by day and disregarded it by night. He also appears to have performed good works while refusing to uphold his end of the social contract by paying taxes he knew were due. It is difficult to view either act as anything but hypocritical; neither provides any basis to warrant a sentence of probation.

---

[3] To be clear, the parties' plea agreement contains a 0- to 10-month range and it acknowledges that this range is a variance from the guideline range. The basis for the variance is not specified; the government believed that in light of the total exposure, defendant should be able to argue for probation as part of an agreed resolution even though it believed a prison sentence is appropriate on the facts of this case. Thus, nothing here should be construed as an argument that defendant may not argue for a sentence of probation based on good works. He is free to make that argument consistent with the plea agreement. The government's position is simply that, even considering any good works performed by defendant, a term of prison is still required on the facts here.

* * *

At the end of the day, probation in this case will have absolutely no deterrent effect. Indeed, the word "deterrence" is not found anywhere in the PSR, although it is a consideration in both the guidelines and 18 U.S.C. § 3553(a)(2)(B). But considering the need for deterrence as expressed by the authorities above, considering who defendant is and what he did, and considering the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, the Court should impose a sentence of between 8 and 10 months in prison.

Respectfully submitted this 10th day of March, 2022.

> GARY M. RESTAINO
> United States Attorney
> District of Arizona
>
> *s/ David R. Zipps*
>
> David R. Zipps
> Assistant U.S. Attorney

A copy of the foregoing has been served electronically or by other means this 10th day of March, 2022, to:

Michael L. Piccarreta, Esq.